CITY OF FAIRBANKS, Michael Pulice, and Patrick B. Cole, Appellants,

v.

Jimmy RICE and Lee DeSpain, Appellees.

Lee DeSpain, Cross–Appellant,

v.

City of Fairbanks, Michael Pulice, and Patrick B. Cole, Cross–Appellees.

Jimmy Rice, Appellant,

v.

City of Fairbanks, Michael Pulice, and Patrick B. Cole, Appellees.

Nos. S–8469, S–8470, S–8479/8489.

Supreme Court of Alaska.

March 17, 2000.

Rehearing Granted Oct. 13, 2000.

John M. Eberhart and Paul J. Ewers, Deputy City Attorneys, Fairbanks, for City of Fairbanks, Patrick B. Cole, and Michael Pulice.

Edward R. Niewohner, Niewohner & Associates, P.C., and Kenneth P. Ringstad, Paskvan Law Offices, P.C., Fairbanks, for Jimmy Rice.

Thomas R. Wickwire, Fairbanks, for Lee DeSpain.

Before MATTHEWS, Chief Justice, EASTAUGH, FABE, BRYNER, and CARPENETI, Justices.

*OPINION*

EASTAUGH, Justice.

## I. *INTRODUCTION*

Jimmy Rice and Lee DeSpain sued the City of Fairbanks (their former employer) and two city employees alleging violations of the Alaska Whistleblower Act resulting in their constructive discharge, and violations of their civil rights under 42 U.S.C. § 1983 of the federal Civil Rights Act. A jury returned verdicts for Rice and DeSpain. The city and its employees appeal; Rice and DeSpain cross-appeal. We affirm because sufficient evidence supports the verdicts, because the city was not entitled to qualified immunity on

the Whistleblower Act claim, and because the superior court did not err in rejecting the defendants' claim that Rice and DeSpain failed to exhaust their administrative remedies. We find no prejudicial error in the parties' other appeal and cross-appeal issues.

## II. FACTS AND PROCEEDINGS

Jimmy Rice and Lee DeSpain were firefighters employed by the City of Fairbanks, Department of Public Safety (fire department). Both were members of the Fairbanks Fire Fighters Association, affiliated with the International Association of Fire Fighters.

In 1994 DeSpain and Rice reported that Michael Pulice, the city's Director of Public Safety and their indirect supervisor, was overstating his "comp" time. The Fairbanks City Council discussed the report on February 13, 1995. The next day Pulice telephoned Fairbanks attorney Brett Wood, knowing that Wood had represented Rice and DeSpain. According to Wood, Pulice threatened during the telephone conversation to retaliate against DeSpain and Rice for their report and other activities unrelated to their employment, and insinuated that he might "set them up" or entrap them. Wood informed City Manager Patrick Cole of the call and asked that Rice and DeSpain be placed on administrative leave until the issue was resolved. Cole declined to do so.

Three other circumstances contributed to animosity between Rice and DeSpain and the city: the city and Pulice allegedly tried to weaken or discredit the fire fighters' union, Rice and DeSpain engaged in surveillance of Pulice, and Rice told then City Manager Mark Boyer that Pulice had had an extramarital affair with Pulice's administrative assistant.

Rejecting the city's recommendation to submit the issue to dispute resolution, DeSpain and Rice resigned, claiming that they were concerned about retaliation and "intolerable" working conditions. When they resigned, DeSpain and Rice had each been employed for at least twenty years with the fire department.

Rice and DeSpain sued the city, former City Manager Cole, and Public Safety Director Pulice. They claimed in their various complaints that the city, Cole, and Pulice had violated the Alaska Whistleblower Act,[1] resulting in the plaintiffs' constructive discharge and the loss of a promotion for Rice, and that Cole and Pulice had violated the plaintiffs' federal constitutional rights of free speech.[2] DeSpain also sued Pulice for defamation, alleging that Pulice had told attorney Wood that DeSpain was involved in an extramarital affair.

The case was tried before a jury. The superior court effectively dismissed the Whistleblower Act claims against Pulice and Cole individually when it allowed the jury to consider those claims only against the city. The court instructed the jury to consider the § 1983 claims against Pulice and Cole.

The jury found for DeSpain on his civil rights claims against Cole and Pulice, on his Whistleblower Act claim against the city, and on his defamation claim against Pulice. It awarded DeSpain damages of $142,901 on his § 1983 and Whistleblower Act claims and damages of $8,050 on his defamation claim. The jury found for Rice on his civil rights claims against Cole and Pulice, and on his Whistleblower Act claim against the city. It awarded Rice damages totaling $353,001.[3]

The superior court granted Cole's motion for a judgment notwithstanding the verdict (JNOV), concluding that Cole was entitled to qualified immunity on the § 1983 claims—the only claims the jury considered against him. The superior court concluded, "[a]t worst, Cole failed to do as much as he could have to investigate the allegations. However, reasonable people with a clear understanding of the law could not disagree that Cole could have reasonably believed his conduct was lawful."

As a prevailing party, Cole moved for attorney's fees; the superior court awarded

---

1. AS 39.90.100 –.150.

2. See U.S. Const. amend. I; 42 U.S.C. § 1983.

3. The jury did not segregate the damages it awarded on the § 1983 and Whistleblower Act claims.

him $5,139. The court awarded Rice attorney's fees of $48,040.94 against the city and $346,739.25 against Pulice. It awarded DeSpain attorney's fees of $168,114.12 against Pulice on DeSpain's successful § 1983 claim.

The court entered judgments for Rice and DeSpain against the city and Pulice, and for Cole against Rice and DeSpain. The city and Pulice (and Cole to the extent issues affect him) appeal from the denials of their motions for summary judgment, directed verdict and JNOV on the constructive discharge issue; denial of qualified immunity to the city on the Whistleblower Act claims; denial of summary judgment against Rice and DeSpain because they did not exhaust their administrative remedies; and denial of defendants' new trial motion. They claim errors in the judgments; in awarding attorney's fees to Rice and DeSpain on their civil rights claims; in denying summary judgment and remittitur on the defamation claim; and in calculating Cole's award of attorney's fees. The Fairbanks Office of the City Attorney represents the city, Cole, and Pulice on appeal, and unless context requires otherwise, we refer collectively to them as "the city."

DeSpain and Rice appeal the JNOV entered against them in favor of Cole on the civil rights claim; they also appeal being precluded from asserting a Whistleblower Act claim against Cole individually. Rice appeals being precluded from asserting a Whistleblower Act claim against Pulice individually; he also appeals from evidentiary rulings and raises issues regarding mitigation of damages. DeSpain also challenges trial time limits the superior court imposed and the denial of discovery master fees.

4. The city cites the following cases to support its claim that isolated and trivial acts of misconduct and an employee's subjective perceptions do not create a claim for constructive discharge: *King v. AC & R Advertising*, 65 F.3d 764, 767–69 (9th Cir.1995); *Calhoun v. Acme Cleveland Corp.*, 798 F.2d 559, 561 (1st Cir.1986); *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985); *Turner v. Anheuser–Busch, Inc.*, 7 Cal.4th 1238, 32 Cal.Rptr.2d 223, 876 P.2d 1022, 1026–27 (1994). The city, arguing that an employee has an obligation to be reasonable and "not to assume the worst," cites *Garner v. Wal–Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir.1987).

## III. DISCUSSION

### A. The City's Appeal: S–8469

#### 1. The constructive discharge issue

Rice and DeSpain asserted in their Whistleblower Act and § 1983 claims that they had been constructively discharged. The jury found that the fire department constructively discharged Rice and DeSpain. The city argues that Rice and DeSpain's decisions to resign were unreasonable as a matter of law. It asserts that the evidence does not support the constructive discharge finding and that the issue should have been dismissed on summary judgment, or by entry of a directed verdict or JNOV.[4]

██ We review denial of a motion for summary judgment de novo.[5] We will reverse denial of a motion for a directed verdict or JNOV only if the evidence, viewed in the light most favorable to the nonmoving party, is such that reasonable people could not differ in their judgment.[6]

██ To prove constructive discharge,[7] employees must show that reasonable persons in their position would have felt compelled to resign.[8] The city argues that the employees' evidence does not support a finding that they reasonably felt compelled to quit.

To support their claims, Rice and DeSpain offered their own testimony and the testimony of attorney Wood and a former police officer. Wood testified that Pulice called him shortly after they reported Pulice's comp time abuses and that Pulice told Wood he "had them set up," and that he was "well-versed in entrapment." Wood testified:

5. *See Western Pioneer, Inc. v. Harbor Enters., Inc.*, 818 P.2d 654, 656 n. 3 (Alaska 1991).

6. *See Brinkerhoff v. Swearingen Aviation Corp.*, 663 P.2d 937, 940 (Alaska 1983).

7. Constructive discharge is not an independent cause of action, but merely satisfies the discharge element in a wrongful discharge claim. We recognized the doctrine of constructive discharge in *Beard v. Baum*, 796 P.2d 1344, 1349–50 (Alaska 1990).

8. *See Cameron v. Beard*, 864 P.2d 538, 547 (Alaska 1993).

Q. Did [Pulice] use the words "set up" at any time?

A. Excuse me. Mr. Pulice told me that he had them set up.

Q. Did he use that in the present tense, the past tense, the future tense; how was that used?

A. Past tense.

Q. That he had them set up?

A. He had them set up.

Q. What did you take that to mean?

. . . .

A. [I]n the context of the statements about being well versed in entrapment and statements—well, he stated that he'd taken great pains to make a case against them. And when he said that they had them set up—you have to understand, Mr. Niewohner, this man is the chief of police of the City of Fairbanks. He's a commissioned police officer. I took it to mean that he had them set up for some sort of a crime or something like that. I mean, that was the way I took it.

Rice and DeSpain testified that they took the threat seriously. Rice testified that, after the telephone call, he began imagining numerous ways in which he might be framed or otherwise edged out of his position. He described ways in which he felt he was vulnerable to criticism from Pulice and how he could be set up on the job because of Pulice's access to the fire department and the police department evidence room. His concerns were amplified because Pulice was the chief of police and Rice's boss, as well as the acting city manager at the time of the telephone call. DeSpain also testified about ways he believed Pulice could entrap him or "set [him] up."

Rice and DeSpain supported the reasonableness of their interpretation of Pulice's words with the testimony of a former police officer, Mike Nielsen, who had worked closely with Pulice for over twenty years. Nielsen stated that he had advised them to take Pulice's threats very seriously, and pointed out to them that Pulice had access to evidence which would easily enable him to frame them with a crime. Nielsen testified: "He had the evidence key. If he wanted to go down and get evidence, he could drop a baggy of marijuana in the back of their car and call an anonymous tip."

On appeal the city claims that this evidence supports only a subjective, unreasonable belief that conditions were so intolerable as to require resignation. It also argues that such single, trivial, or isolated acts of misconduct are generally insufficient to support a constructive discharge claim.[9]

■ We are unwilling to say that the evidence is insufficient as a matter of law to support a finding that the resignations were reasonable. We assume for discussion's sake that an irrational and unsupported fear of framing would not support a finding of constructive discharge. But fear created by an actual threat of framing and bolstered by evidence of means and will is sufficient to support the jury's verdict. It was for the jury to evaluate the city's allegation that Rice and DeSpain's behavior was inconsistent with their claims and any weakness in plaintiffs' evidence.[10] The superior court did not err in declining to grant the city summary judgment, a directed verdict, or a JNOV on this issue.

2. *Cole's qualified immunity*

Rice and DeSpain asserted claims against the city, Cole, and Pulice under the Alaska Whistleblower Act.[11] The superior court allowed the jury to consider the Whistleblower Act claims against only the city, and not against Cole and Pulice. The jury found the city liable.

---

**9.** In support, the city cites *King*, 65 F.3d at 767–69, and *Turner*, 32 Cal.Rptr.2d 223, 876 P.2d at 1023–26.

**10.** *See VECO, Inc. v. Rosebrock*, 970 P.2d 906, 915–16 (Alaska 1999) (declining to weigh evidence or assess witness credibility in reviewing JNOV on element of sexual harassment claim involving reasonableness of plaintiff's beliefs);

*see also Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1559–60 (11th Cir.1988) (reversing JNOV for employer because reasonable jury could have concluded, applying objective reasonable person standard, that plaintiff felt compelled to resign).

**11.** AS 39.90.100–.150.

The Whistleblower Act claim against the city was based in part on the acts of former City Manager Cole. Those acts also provided the factual basis for DeSpain's and Rice's § 1983 civil rights claims against Cole. The jury found Cole liable under § 1983 for those acts. But after concluding that Cole was entitled to qualified immunity, the superior court granted Cole a JNOV on the § 1983 claims. The city argues that if Cole was entitled to immunity on the § 1983 claims of retaliatory conduct, reasonable people likewise had to find that the city was entitled to immunity under the Alaska Whistleblower Act because the city acted through Cole.

■ The city relies on AS 09.65.070(d)(2), which grants discretionary function immunity to municipalities.[12] This immunity is qualified and does not bar liability for a municipality's discretionary act if that act is alleged to have violated a statute.[13] The city requested a jury instruction on qualified immunity in context of the Whistleblower Act claims. But the requested instruction was not given.

■ It is unnecessary to decide whether it was error in context of Cole's acts to reject the city's request for a qualified immunity instruction, because Pulice's acts provided an alternative basis for holding the city liable on the Whistleblower Act claim. Pulice did not assert a qualified immunity defense, and the city does not argue on appeal that Pulice was entitled to immunity. Because the jury found Pulice liable for doing the same things which potentially made the city, as Pulice's employer, vicariously liable under the Whistleblower Act, Cole's possible immunity would not have excused the city.

3. *Exhaustion of administrative remedies*

The city argues that Rice and DeSpain failed to exhaust their administrative remedies under their collective bargaining agreement (CBA) with respect to their Whistleblower Act claims and the constructive discharge issue. The city also argues that Rice failed to exhaust his administrative remedies as to his assertion that the city failed to promote him. Rice and DeSpain argue that Whistleblower Act and § 1983 claims do not require exhaustion of state administrative remedies, and that the city waived the failure-to-exhaust issue with respect to constructive discharge.

■ The CBA required the parties to arbitrate disputes that could not be resolved through internal grievance procedures.[14] Rice initially pursued a grievance but resigned before it was resolved. The superior court ruled that exhaustion was not required and denied the city's motion for summary judgment. We review for abuse of discretion a trial court's decision whether to require exhaustion of administrative remedies.[15]

■ We first conclude that the exhaustion requirement does not apply to a damage claim under the Alaska Whistleblower Act. The city correctly argues that an employee must exhaust contractual or administrative remedies before pursuing direct judicial action.[16] This general rule includes exhaustion of contractual remedies such as grievance procedures.[17] But the Whistleblower Act provides for remedies that would not have been available under the city's CBA grievance procedure.[18] We have previously held

---

**12.** AS 09.65.070(d) provides:

> An action for damages may not be brought against a municipality or any of its agents, officers, or employees if the claim ... (2) is based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty by a municipality or its agents, officers, or employees, whether or not the discretion involved is abused....

**13.** *See Integrated Resources Equity Corp. v. Fairbanks N. Star Borough,* 799 P.2d 295, 301 (Alaska 1990).

**14.** *See* AS 23.40.070–.260.

**15.** *See State v. Beard (Beard IV),* 960 P.2d 1, 5 (Alaska 1998); *Broeckel v. State, Dep't of Corrections,* 941 P.2d 893, 896 n. 2 (Alaska 1997).

**16.** *See Romulus v. Anchorage Sch. Dist.,* 910 P.2d 610, 615 (Alaska 1996).

**17.** *See Cozzen v. Municipality of Anchorage,* 907 P.2d 473, 477 (Alaska 1995).

**18.** *See* AS 39.90.120 (providing for punitive damages and civil penalties for whistleblower claims).

that arbitration does not afford an exclusive remedy where a statute provides for relief unavailable through arbitration.[19]

The legislature intended to discourage and remedy retaliation against whistleblowers by authorizing them to bring civil actions.[20] We therefore think it unlikely that the legislature intended to require that whistleblowing employees administratively exhaust their Whistleblower Act claims. In *Public Safety Employees Ass'n v. State*,[21] we held that employees' claims for failure to maintain fit premises and for harassment were arbitrable under a collective bargaining agreement, but claims for retaliatory rent and waiver of statutory rights were not arbitrable.[22] Under the express provisions of that agreement, only claims involving interpretation or application of the agreement's terms were arbitrable.[23] Having drawn this distinction between arbitrable and non-arbitrable claims, we concluded that the employees were not precluded from exercising their statutory remedies under the Uniform Residential Landlord–Tenant Act for even arbitrable claims because that act explicitly barred waiver of rights or remedies under the act, and afforded remedies that were unavailable under the act.[24]

■ Although a constructive discharge claim is arbitrable,[25] here the employees alleged constructive discharge only to support their Whistleblower Act and § 1983 claims, not to support a wrongful termination cause of action. The claims they asserted do not require exhaustion of administrative remedies. And the facts underlying the Whistleblower Act claim and any constructive discharge intertwine. We will not require employees to sever those issues and arbitrate one before proceeding judicially on the other.[26] Likewise, Rice was not required to pursue a failure-to-promote administrative claim because his assertion that he was not promoted is closely aligned with his Whistleblower Act and § 1983 claims.[27]

*State v. Beard (Beard IV)* is not contrary.[28] We there held that Beard's constructive wrongful discharge claim was foreclosed by his failure to exhaust his administrative remedies[29] and held that requiring exhaustion "promotes judicial efficiency by affording an institution an opportunity to correct its own errors, so as to render judicial action unnecessary."[30] But a Whistleblower Act claim is not the equivalent of a constructive wrongful discharge claim. The superior court correctly noted that to sustain Whistleblower Act claims, employees must show that they were discharged or deprived of employment benefits because of their whistleblower activities. This additional showing of retaliation makes a Whistleblower Act

**19.** See *Public Safety Employees Ass'n v. State*, 658 P.2d 769, 774–75 & n. 17 (Alaska 1983). *Accord Barrentine v. Arkansas–Best Freight Sys., Inc.*, 450 U.S. 728, 745–46, 101 S.Ct. 1437, 67 L.Ed.2d 641 (1981); *Bridgeton Educ. Ass'n v. Board of Educ.*, 132 N.J.Super. 554, 334 A.2d 376, 378 (1975).

**20.** See AS 39.90.120.

**21.** 658 P.2d 769 (Alaska 1983).

**22.** See *PSEA*, 658 P.2d at 774–75.

**23.** See *id.* at 772–73.

**24.** See *id.* at 774–75.

**25.** See *Beard IV*, 960 P.2d at 7–8.

**26.** See *PSEA*, 658 P.2d at 775.

**27.** The city raises this issue only as to Rice, not DeSpain. DeSpain argues on appeal that the

city did not raise the exhaustion defense as to any of DeSpain's claims. Although the city argues in its appellate reply brief that DeSpain failed to exhaust his administrative remedies, the record citations in support establish that the city's superior court exhaustion motion related only to Rice, and not DeSpain.

It also appears that the city did not raise a failure-to-exhaust defense in the superior court with respect to Rice's assertion that he was constructively discharged. Rice argues on appeal that the city waived this issue by failing to raise it in the superior court. The city does not address Rice's waiver argument in its reply brief. The superior court addressed only the Whistleblower Act exhaustion issue and other issues not raised on appeal.

**28.** See *Beard IV*, 960 P.2d at 8.

**29.** See *id.*

**30.** *Id.* at 5.

claim more akin to a civil rights claim under § 1983, to which no exhaustion requirement applies. And by its very nature, because it is based on allegedly retaliatory conduct, a judicial Whistleblower Act claim is predictably less likely to be avoided by arbitration.

Therefore, we hold that it was not an abuse of discretion to refuse to dismiss Rice's claims for failure to exhaust administrative remedies.

### 4. *New trial for alleged litigation misconduct*

The city argues that because Rice and DeSpain and their counsel engaged in deliberate misconduct with respect to rules of evidence, trial procedure, protective orders, and evidentiary rulings, it was error to deny the city's new trial motion.

The superior court denied the city's new trial motion because the city failed to move for a mistrial first; the court observed that the city chose to take its chances with the jury it had.

■■■ The superior court agreed that Rice's attorney had engaged in misconduct at trial by repeatedly disregarding in limine orders and by failing to seek court permission before introducing "bad acts" evidence under Alaska Evidence Rule 404(b). The court also observed that Rice and DeSpain "felt free to say anything they wanted on the stand and frequently violated court orders when doing so." But these observations do not establish that the failure to grant a new trial was an abuse of discretion.

■■■ Reversal of a trial court's denial of a new trial motion is appropriate only in exceptional circumstances to prevent a miscarriage of justice.[31] The city points to no misconduct which so prejudiced the city that a miscarriage of justice will result absent a new trial. Instead, the city merely argues that although "no single incident, in and of itself, provided grounds for granting a new trial, the cumulative effect does." The trial

judge is in the best position to determine whether misconduct can be cured only by granting a new trial, and whether the failure to timely request lesser remedies indicates a tactical choice. The superior court evidently believed that the city was content with the jury until it returned the verdict. We are not convinced that the superior court erred in resolving the motion.

### 5. *Alleged errors in entering the judgments*

■■■ The city next raises procedural issues. It argues that the special verdict forms were ambiguous because they did not require the jury to specify which of three alternative grounds were the basis for finding that Pulice was liable. It argues that ambiguities in the special verdict forms should be resolved in favor of the defendants. But we do not find special verdict Interrogatory 4 or Interrogatory 8 to preclude entry of judgment against the city and Pulice. Only three claims for relief were submitted to the jury: the Whistleblower Act claims, the § 1983 claims, and DeSpain's defamation claim. Because the superior court did not allow the jury to consider Whistleblower Act claims against Pulice (or Cole), the jury's verdicts require us to conclude that the jury found against Pulice on the § 1983 claims. We perceive no ambiguity.

### 6. *Attorney's fees awarded to Rice and DeSpain*

■■■ The jury awarded Rice and DeSpain each one dollar for noneconomic damages. The city argues that these nominal awards were for their § 1983 claims, and that it was therefore error to award Rice and DeSpain substantial attorney's fees under 42 U.S.C. § 1988.

■■■ This issue is so sparely briefed that it is effectively waived.[32] The city's brief does not even squarely assert that the court granted any fees to Rice and DeSpain under § 1988, or what amounts it granted.[33] The

---

**31.** *See State v. Municipality of Anchorage,* 805 P.2d 971, 973 (Alaska 1991).

**32.** *See Adamson v. University of Alaska,* 819 P.2d 886, 896 n. 3 (Alaska 1991).

**33.** The superior court awarded DeSpain attorney's fees against Pulice in the amount of $168,114 and awarded Rice attorney's fees against Pulice in the amount of $346,739. Be-

city does not object to the manner in which Rice and DeSpain's fee awards were calculated, but asserts that the nominal damages awards precluded fee awards under § 1988.[34] Even if the city had not waived the issue, its argument would fail. Rice and DeSpain's § 1988 awards were justified by the jury's substantial damage verdicts. These awards, totaling $353,001 for Rice and $142,901 for DeSpain, reflected damages arising from the defendants' retaliatory interference with the plaintiffs' rights of free speech. Therefore, it was not error to grant them attorney's fees under § 1988.

### 7. *Defamation claim*

DeSpain sued Pulice for defamation, alleging that Pulice made defamatory statements intimating that DeSpain had had an extramarital affair with a friend's wife. The statements giving rise to this claim occurred during the Pulice–Wood telephone conversation which was also the basis for Rice and DeSpain's assertions that they had been constructively discharged. Pulice told Wood that he had received a report from a private individual that DeSpain had an extramarital affair. According to Wood, Pulice also implicitly threatened to repeat the rumor to third parties.

■■■ The city argues that the superior court should have dismissed DeSpain's defamation claim on summary judgment because Pulice's call to attorney Wood, DeSpain's agent, was not a "publication." Courts elsewhere are split on whether a defamatory communication to an agent is a "publication."[35] But there is no evidence here that DeSpain had authorized Wood to act as DeSpain's agent for the purpose of receiving communications on the subject of Pulice's

statements. Absent any such evidence, we think the better rule is that a communication to an attorney can be a publication. Because the city on appeal points to no evidence that Wood had authority to act as an agent to receive such communications, the city cannot prevail on this issue.

■ The city next argues that DeSpain's defamation claim should have been dismissed absent evidence of special harm. We conclude that the superior court did not err in holding that Pulice's statement to Wood was defamatory per se, obviating the need for proof of damages. We have previously recognized that imputation of sexual misconduct is defamatory per se.[36] The superior court concluded that allegations of marital infidelity were allegations of serious sexual misconduct. We agree. It was not error to deny the city's summary judgment motion on DeSpain's defamation claim.

■ The city finally contends that because DeSpain failed to establish any harm to his reputation, the superior court should have remitted the damages the jury awarded DeSpain for defamation.

■ Remittitur is proper when a jury, without acting under the type of passion or prejudice that would warrant a new trial, nonetheless awards an amount that is unreasonable given the evidence.[37] The appropriate measurement is the "maximum possible recovery" a reasonable jury could have awarded.[38]

■ A defamed party may recover damages for harm to reputation, wounded feelings and humiliation, resulting physical ailments, and estimated future damages of the

---

cause § 1983 was the only possible basis for the jury's verdict against Pulice, the court must have awarded those fees under authority of § 1988.

**34.** In support, it cites *Farrar v. Hobby*, 506 U.S. 103, 115, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) (affirming denial of fees to party who originally sought $17 million and injunctive relief but received only nominal damages). *But see Brandau v. State of Kansas*, 168 F.3d 1179, 1182–83 (10th Cir.1999) (affirming attorney's fee award to plaintiff who originally sought $50,000 and lost wages but received only nominal damages).

**35.** *See* W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 113, at 798–99 (5th ed.1984).

**36.** *See French v. Jadon, Inc.*, 911 P.2d 20, 32 (Alaska 1996).

**37.** *See Exxon Corp. v. Alvey*, 690 P.2d 733, 741 (Alaska 1984).

**38.** *Id.* at 742.

same kind.[39] A wide range of damages is generally allowable, "running from six cents to $1,000,000 in compensatory damages with an additional $1,250,000 in punitive damages."[40] In Alaska, defamation damages of $10,000 have been affirmed on appeal.[41] We are not persuaded that the defamation award of $8,050 exceeds the maximum amount permissible for the intangible harms resulting from this defamation.

### 8. *Attorney's fees awarded to Cole*

The superior court awarded Cole attorney's fees of $5,139, divided between Rice and DeSpain. Cole argues that the court abused its discretion by rejecting Cole's "methodology" and in undervaluing time spent by the city's staff attorneys.

As a prevailing party, Cole, through the city, moved for attorney's fees against Rice and DeSpain.[42] His initial request was based on incurred fees which he claimed had a total value of $384,168.25. This total valued the time of the city's staff attorneys at $75 per hour and the time of retained attorneys at their billed rates. When the superior court ruled Cole could not recover fees on the § 1983 claims and required him to segregate the fees "that apply solely to the state claims," Cole recalculated the base total as $290,396.43.[43] This figure valued the staff attorneys' time at $150 per hour, reduced the time of outside counsel by forty-five percent to compensate for the mix of state and federal claims, and deleted time spent solely representing other defendants.

The superior court then ordered Cole "to properly segregate the fees spent solely in defense of state claims against him." In response, Cole submitted affidavits establishing that attorney's fees totaling $17,130 had been incurred on his behalf on the state-law-only claims. The superior court awarded Cole thirty percent, $5,139, of that amount.

 Cole argued below and implicitly argues here that the common nature of the various claims made it "largely" impossible to segregate the time and that his approach of discounting fees by forty-five percent was reasonable and conservative. We conclude that the superior court permissibly required segregation between federal and state-law claims.[44] It properly declined to award fees based on services performed in defending the § 1983 claims. And we conclude that in limiting the award to services performed defending the state-law claims against Cole, the superior court did not abuse its discretion by rejecting Cole's apportionment scheme in preference for exact time records specifying the actual time spent defending Cole on state-law claims.

 Cole next argues that it was error to value staff city attorney time at $75 per hour. Cole's superior court filings established that for internal purposes the city attorney's office valued staff time at $75 per hour and his original calculation valued the staff attorneys' work at that rate. Cole's revised calculation requested a "reasonable market value" of $150 per hour for the staff attorneys' time. The court's award was based on a $75 hourly rate for staff attorneys, but valued the time of outside counsel at the rates they charged. On appeal Cole tersely argues for "reasonable" fees but does not specify the rate he believes correct or address any of the policy questions this issue potentially raises.[45] We

39. *See Prosser & Keeton* § 112, at 794.

40. *Id.* at 795.

41. *See Alaska Statebank v. Fairco*, 674 P.2d 288, 294–96 (Alaska 1983).

42. The city had agreed to defend and indemnify Cole.

43. A fee award for a prevailing party who recovers no money judgment is presumptively thirty percent of the total fees actually incurred. *See* Alaska R. Civ. P. 82(b)(2). Cole sought an enhanced award under Rule 82(b)(3).

44. *See Balough v. Fairbanks N. Star Borough*, 995 P.2d 245, 270–71 (Alaska 2000) (superior court may award fees for state-law claims segregated from § 1983 claims); *Lyman v. State*, 824 P.2d 703, 707 (Alaska 1992) (superior court may require party seeking costs to identify and segregate state-law claims from federal-law claims).

45. Cole also asserts that it was error not to award him costs and prejudgment interest. Because he totally fails to explain the nature of either alleged error, we deem these issues waived for purposes of appellate review. *See Adamson v. University of Alaska*, 819 P.2d 886, 889 n. 3 (Alaska 1991).

conclude that it was not an abuse of discretion to rely on the city's internal $75 hourly rate in this case.

The case the city cites in support, *AMFAC Hotels v. State, Department of Transportation*,[46] does not require finding an abuse of discretion here. We there held that it "was well within the trial court's discretion" to calculate the state's fees by substantially reducing the time spent by counsel for the state and applying an average private billing rate of $75 per hour.[47] That opinion did not require trial courts to value staff counsel's time at private billing rates.

Accordingly, we discern no clear abuse of discretion.

### B. Rice's and DeSpain's Appeals: S–8470/8479/8489

#### 1. JNOV for Cole on qualified immunity

 The jury determined that Cole was not entitled to qualified immunity; it found that Cole could not reasonably have believed that his conduct did not violate Rice's right to free speech. The superior court, however, granted JNOV for Cole on this issue stating that "reasonable people would not disagree that Cole could have reasonably believed his conduct was lawful within the context of the information he knew and the actions he took." The court explained that "Cole took no action which deprived Rice or DeSpain of any free speech right.... At worst, Cole failed to do as much as he could have to investigate the allegations."

"The standard of review for motions for directed verdict and judgment n.o.v. is 'to determine whether the evidence, when viewed in the light most favorable to the nonmoving party, is such that reasonable men could not differ in their judgment.' "[48]

 We agree with the superior court's analysis because it is consistent with principles underlying the application of qualified immunity. Federal qualified immunity shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[49] It is applied liberally to protect government officials who exercise discretion when making policy decisions or balancing competing considerations.[50] If there is a "legitimate question" as to whether an official's conduct constitutes a constitutional violation, the official is entitled to immunity.[51] "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."[52] Given Cole's limited role in the events giving rise to the constitutional violations, we agree with the superior court's reasoning and conclude that Cole was entitled to a JNOV.

#### 2. Dismissal of Whistleblower Act claims

 The superior court dismissed the Whistleblower Act claims against Pulice and Cole; it allowed the jury to consider those claims only as against the city.[53] After the trial ended, we ruled in another case that Whistleblower Act claims can be brought against individual defendants.[54] Given that ruling, it was error to dismiss the Whistleblower Act claims against the individual defendants. Rice claims that this error re-

**46.** 659 P.2d 1189, 1194 (Alaska 1983), *overruled on other grounds by Atlantic Richfield Co. v. State of Alaska*, 723 P.2d 1249, 1252 n. 4 (Alaska 1986). The state's attorneys there spent about 611 hours. The superior court applied private rates of $75 per hour, but reduced the hours to 250, and then awarded twenty percent of the total, for a fee award of $3,750. *See* 659 P.2d at 1194.

**47.** *Id.*

**48.** *Bendix Corp. v. Adams*, 610 P.2d 24, 27 (Alaska 1980) (quoting *Holiday Inns of America, Inc. v. Peck*, 520 P.2d 87, 92 (Alaska 1974)).

**49.** *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

**50.** *See Benson v. Allphin*, 786 F.2d 268, 276 (7th Cir.1986).

**51.** *Wiley v. Doory*, 14 F.3d 993, 995 (4th Cir. 1994).

**52.** *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir.1992).

**53.** *See* AS 39.90.120(a).

**54.** *See Alaska Hous. Fin. Corp. v. Salvucci*, 950 P.2d 1116, 1124–25 (Alaska 1997).

quires reversal as to both Cole and Pulice; DeSpain argues that the error requires reversal as to Cole, but does not raise the issue as to Pulice. The city concedes that dismissal was error, but argues that the error was harmless.

■ We conclude that the error was harmless as to both Cole and Pulice. In deciding whether an official is entitled to discretionary function immunity under AS 09.65.070(d)(2), we apply the federal standard for qualified immunity in § 1983 claims.[55] Because we affirm the court's determination that Cole was entitled to qualified immunity under § 1983, Cole also would have been entitled to discretionary function immunity under state law. Thus, the error of dismissing the Whistleblower Act claims against Cole as an individual was harmless.

As to Pulice, the city argues that the § 1983 and Whistleblower Act claims against him are identical, and that remanding the Whistleblower Act claims for trial could lead to a double recovery. The jury found Pulice liable under § 1983 for his retaliatory conduct and awarded Rice (and DeSpain) damages for lost past and future wages and benefits. The Whistleblower Act claims were based on the same conduct and losses that resulted in the damages verdict for Rice under § 1983. Rice's recovery of that verdict establishes that the error of dismissing Rice's Whistleblower Act claim against Pulice individually did not prejudice Rice.

### 3. *Time limits at trial*

Although he prevailed at trial, DeSpain challenges time limits the superior court imposed on the presentation of his case. The court allowed each side ten days to present its case. DeSpain agreed that Rice, who was to address their common issues, should have six of their ten days. At trial, DeSpain claimed his time was insufficient and requested four additional hours; the superior court gave him an extra half-hour. DeSpain now argues that he was forced to curtail his cross-examination of two unspecified defense witnesses and his closing argument.

■ Although he agrees with the city that any error is harmless, DeSpain asks us to consider it because it presents an important and recurrent issue capable of evading review.[56] We decline to consider it here. The issue necessarily depends on the facts of each case. We are not willing to condemn time limits in the abstract, and the issue can be raised by a party actually claiming prejudice. Moreover, DeSpain's conclusory arguments that his case was curtailed do not establish error or prejudice. They give us no basis for saying that these time limits were inappropriate, or for offering guidance to the trial courts.

### 4. *DeSpain's discovery master fees*

The superior court appointed a discovery master and ordered DeSpain to pay his portion of the master's fees. After he prevailed at trial, DeSpain moved to recover the fees he had paid. The superior court denied his motion on the ground that the parties' "unreasonable conduct" had required the appointment. "Had counsel cooperated, no expense would have been incurred. Each party must pay the master's expense; the court finds that it should not be a shifted expense under [42 U.S.C.] § 1988."

■ Section 1988 awards are reviewed for abuse of discretion if grounded in factual findings[57] and are reviewed de novo if they are grounded in statutory interpretation.[58]

■ DeSpain does not claim that it was error to appoint the discovery master, only that it was an abuse of discretion not to shift to the city DeSpain's share of the master's

**55.** *See Integrated Resources Equity v. Fairbanks N. Star Borough,* 799 P.2d 295, 301 (Alaska 1990) (applying "clearly established" law test to discretionary function immunity claim under AS 09.65.070(d)(2)); *Breck v. Ulmer,* 745 P.2d 66, 72 (Alaska 1987) (adopting two-prong test articulated by Supreme Court in *Harlow,* 457 U.S. at 818–19, 102 S.Ct. 2727).

**56.** *See Hayes v. Charney,* 693 P.2d 831, 834 (Alaska 1985) (noting public interest exception to mootness doctrine).

**57.** *See United Steelworkers of Am. v. Phelps Dodge Corp.,* 896 F.2d 403, 405–06 (9th Cir.1990).

**58.** *See id.* at 407.

expense. But § 1988 does not mandate such an award, and DeSpain has not demonstrated that it was an abuse of discretion to deny his motion. We affirm the denial.

### 5. *Mitigation of Rice's damages*

 The jury found that Rice failed to mitigate his economic damages, and reduced his damage award.[59] Rice does not deny that he had a duty to mitigate his damages, but he contends that he was only required to seek comparable employment, that the jury was erroneously instructed about what constitutes comparable employment, and that no evidence supported the jury's verdict on the mitigation issue.

"The goal of contract damages is to place the nonbreaching party in as good a position as if the contract had been fully performed." *Alyeska Pipeline Serv. Co. v. H.C. Price Co.*, 694 P.2d 782, 787 (Alaska 1985). In the case of wrongful discharge, this generally means that the employee "is entitled to the total amount of the agreed upon salary for the unexpired term of his employment, less what he could earn by making diligent efforts to obtain similar employment." *Skagway City School Bd. v. Davis*, 543 P.2d 218, 225 (Alaska 1975), *overruled on other grounds, Diedrich v. City of Ketchikan*, 805 P.2d 362, 366 (Alaska 1991).[60]

The jury was instructed that "an employee who is constructively discharged in violation of law has a duty to take steps to minimize the loss by making a reasonable effort to find other comparable employment." The instruction also allowed the city to reduce any damages by proving that "it is more likely true than not true that the plaintiff could have avoided some losses in whole or in part with reasonable efforts and without undue risk, expense, hardship or embarrassment...." The parties seem to agree that "comparable employment" is the same as or analogous to "similar employment."

██ The propriety of a jury instruction is a question of law subject to our independent review.[61] Rice objects to the court's instruction, contending that "[m]itigation based on a rule that plaintiff must accept employment that would not cause undue risk, expense, hardship or embarrassment is inconsistent with the duty imposed by 'comparable employment.' "

We think the court adequately instructed the jury about the factors relevant to assessing Rice's ability to obtain comparable employment. The instruction required the jury to consider whether the city had proved that the replacement employment would not involve "undue risk, expense, hardship or embarrassment." The jury heard opposing testimony about Rice's employment prospects. This testimony and the instruction offered sufficient information and guidance to the jury in evaluating whether the employment available to Rice was "similar" or "comparable."

██ Rice also argues that the evidence was insufficient to justify submitting the issue to the jury. Submission of a question to the jury is appropriate when the evidence is such that reasonable people could differ in their conclusions.[62] The testimony of Carl Gann, the city's vocational consultant, permitted an inference that a person with Rice's training who used reasonable efforts in seeking a substitute job could find work in the fire fighting or paramedic field in the vicinity of Fairbanks. Counsel for Rice vigorously cross-examined Gann, and obtained admissions that many of the positions were not open to Rice. But that cross-examination did not foreclose any permissible inference that Rice could have obtained substitute employment that was sufficiently similar to require mitigation efforts.

---

**59.** The jury calculated Rice's damages verdict of $353,000 by first finding Rice's total losses to be $1,716,700, and then subtracting $75,200 for "[a]ctual earnings or pension payments which would not have been earned," and also subtracting $1,288,500 for the "[a]mount which should have been earned through reasonable and diligent efforts."

**60.** *Luedtke v. Nabors Alaska Drilling, Inc.*, 834 P.2d 1220, 1226 (Alaska 1992).

**61.** *See Anchorage Nissan, Inc. v. State*, 941 P.2d 1229, 1240 n. 22 (Alaska 1997).

**62.** *See Cummins v. King & Sons*, 453 P.2d 465, 466–67 (Alaska 1969).

We conclude that it was not error to submit the mitigation issue to the jury, and that the mitigation instruction adequately informed the jury of the factors relevant to this case.

### 6. *Exclusion of evidence of Pulice's conduct*

██ Rice challenges the superior court's exclusion of evidence of alleged misconduct after Pulice telephoned Wood on February 14, 1995. Rice claims that the evidence was relevant to prove the working conditions that caused his constructive discharge. But February 14, 1995 was the watershed date on which Pulice made threats, and Rice has not explained on appeal what evidence was excluded, how any excluded evidence substantively differed from admitted evidence, and how the excluded evidence might have affected a jury that nonetheless awarded Rice substantial damages. Rice has not demonstrated that the superior court abused its discretion or that the exclusion harmed him.

### 7. *Other evidentiary rulings*

Rice raises five additional evidentiary rulings in his cross-appeal.[63] Although he argues with respect to each that the superior court erred, he does not establish how exclusion of this evidence prejudiced him, whether the jury heard equivalent evidence, or what relief would be justified as to any of the alleged errors. We perceive no prejudicial error that would require appellate relief for Rice on any of these rulings.

### IV. *CONCLUSION*

For the reasons explained above, we AFFIRM the judgment and rulings below.

---

**63.** Rice appeals: the exclusion of evidence regarding Pulice's interview for the position of Director of Public Safety; the refusal of the discovery master to review a Fairbanks City Council Executive Session tape; the discovery master's refusal to compel the mayor of Fairbanks to answer deposition questions; the exclusion of expert opinions on Pulice's qualifications for his job; and the exclusion of testimony of prior acts of Pulice.